UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MONNIE PRYOR,                          )
                                       )
                    *Plaintiff*        )
                                       )    Cause No. 1:21-cv-2234-RLM-TAB
            v.                         )
                                       )
ASCENSION HEALTH ALLIANCE,             )
INC.,                                  )
                                       )
                    *Defendant*        )

<u>OPINION AND ORDER</u>

Monnie Pryor sued her former employer, Ascension Health Alliance, Inc., under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Ms. Pryor alleges Ascension (1) discriminated against her based on her age when it didn't promote her and (2) retaliated against her based on her age, race, and gender for complaining about her treatment. Ascension has moved for summary judgment on both claims. For the reasons explained in this order, the court grants Ascension's motion.

I.    BACKGROUND

The court presents the record in the light most favorable to the nonmoving party at summary judgment. <u>Eaton v. J.H. Findorff & Son, Inc.</u>, 1 F.4th 508, 511 (7th Cir. 2021).

Ascension is a nonprofit health system. Ms. Pryor—a Black woman—started working at Ascension when she was 35 years old. She transferred internally to a role in Ascension's call center, and then to human resources, where she was a business advisor.

Ms. Pryor replaced Kellie Harris as a business advisor. Ms. Harris had been promoted to business partner. Ms. Harris is a white woman about 8 years younger than Ms. Pryor. Ms. Pryor says that although she was an advisor, she also worked unofficially as a partner when Ms. Harris was promoted to a different role. Ascension says Ms. Pryor only ever took over Ms. Harris's work as an advisor, not as a partner.

*Ms. Pryor's Conflict with Ms. Harris*

In March 2019, Ms. Pryor's supervisor, Jason Pagan, asked Ms. Pryor to work on several executives' terminations—a task Ms. Harris would normally handle. Ms. Pryor heard from another employee that Ms. Harris couldn't be involved because she had a relationship with one of the executives being terminated. Ms. Pryor shared the information with Mr. Pagan, who then shared it with Ms. Harris and indicated that the relationship was physical or sexual. Ms. Harris testified that she stopped having personal conversations with Ms. Pryor after hearing about the rumor.

In June 2019, Steven Kile replaced Mr. Pagan; he reported directly to Edward Daech, the regional vice president. Ms. Pryor texted Mr. Daech to report

that she'd heard from someone else that Ms. Harris said Mr. Kile was incompetent. Word about Ms. Pryor's report reached Ms. Harris. Ms. Pryor says that over the next few months, Ms. Harris excluded her from work communications and rolled her eyes and interrupted her when Ms. Pryor talked in meetings. Ms. Pryor says she repeatedly asked Mr. Kile to schedule a meeting to address her issues with Ms. Harris and told him Ms. Harris was bullying her. In August 2019, she reached out to both Mr. Kile and Mr. Daech, and Mr. Daech scheduled a meeting to address her concerns. Ms. Pryor doesn't recall whether the meeting took place but says if it was scheduled, it happened.

In November 2019, Ms. Harris approached Mr. Kyle to discuss her issues with Ms. Pryor. The three had a meeting, which Ms. Pryor recorded. She sent the recording to Mr. Daech and then emailed Mr. Daech, Mr. Kyle, and Ms. Harris to complain that she felt bullied, didn't receive adequate support, and had been excluded from work communications, and she felt it was a hostile work environment. Mr. Daech subsequently led a meeting in which Ms. Pryor and Ms. Harris resolved to their conflict. Ms. Pryor testified that each time she complained to Mr. Daech, she told him she felt she was being treated unfairly because she is an older Black woman. Mr. Daech disputed that Ms. Pryor ever said anything about her age, race, or gender when complaining about Ms. Harris. Ms. Pryor also told Mr. Kile she was disappointed that her requests for meetings to deal with the conflict had been ignored, whereas as soon as Ms. Harris asked for a meeting, he set one.

Laura Atkinson replaced Mr. Kile in February 2020. Ms. Atkinson is seven years older than Ms. Pryor. She didn't work in Indiana during the conflict between Ms. Harris and Ms. Pryor, and Ascension says she didn't know about it. Ms. Pryor thinks Ms. Atkinson knew about her issues with Ms. Harris because Ms. Atkinson seemed to have a "preconceived notion about her."

*Ms. Pryor's Corrective Action*

In the spring of 2020, Ms. Pryor worked on an employee's termination. Ascension says the employee was on family medical leave when she was terminated, and she told Ms. Pryor she was going to challenge the termination decision. In that situation, Ascension policy requires the advisor to explain Ascension's problem resolution process to the employee. Ascension says Ms. Pryor instead told the employee that the "termination was standing and that was the process." Ms. Pryor says the employee had been approved for family medical leave but was in the office when she was terminated. Ms. Pryor says the employee called her to complain about being terminated while on leave but didn't ask for the problem resolution process. Ms. Pryor says Ms. Harris trained her to not explain the process unless an employee specifically requests it.

Ms. Pryor told Ms. Atkinson that the employee was upset about her termination. Ms. Atkinson investigated and concluded that Ms. Pryor stepped into a managerial role by communicating the termination decision, didn't follow the proper protocols by not explaining the problem resolution process, and

improperly terminated the employee while she was using family medical leave, which could expose Ascension to liability. Accordingly, Ms. Atkinson issued Ms. Pryor a "corrective action."

Ms. Pryor appealed the corrective action, which involved meeting with Ms. Atkinson. Ascension says Ms. Pryor disagreed with the discipline at the meeting, but accepted responsibility and signed off on it. Ms. Pryor says she told Ms. Atkinson she thought the corrective action was retaliation for complaining about Ms. Harris, and Ms. Atkinson said that wasn't true. Ms. Atkinson denies that Ms. Pryor brought up her conflict with Ms. Harris during their meeting about the corrective action. Ms. Atkinson didn't withdraw the corrective action.

Ms. Pryor took the next step in the appeal process by meeting with Mr. Daech. He told her she was being emotional and unhappy with her job. He didn't withdraw the corrective action. Ms. Pryor says she chose not to escalate her complaint further to avoid being labeled as a "troublemaker" or an "angry Black woman."

*Ms. Pryor Isn't Promoted to Partner*

In the summer of 2020, Ascension restructured its human resources department, creating two new partner positions. Ms. Atkinson was solely responsible for choosing which advisors to promote to partner. Five advisors expressed interest in the openings, and Ms. Atkinson interviewed four of them, including Ms. Pryor.

Employees aren't eligible to transfer to a new position if they have a documented disciplinary action (including corrective actions) within the previous twelve months. Ascension policy gave Ms. Atkinson the discretion to waive that limitation if Mr. Daech also consented. Accordingly, Ms. Atkinson still interviewed Ms. Pryor for the partner openings so she could select the best candidates; she testified that she would have waived the disciplinary action rule had Ms. Pryor been one of the best candidates. The partner role has some overlap with advisor duties but focuses on national strategy development, so Ms. Atkinson thought the best candidates would be capable of strategic or systematic thinking.

Ascension says Ms. Atkinson relied solely on the interviews to choose the new partners, and she didn't consider prior performance evaluations, amount of human resources work experience, or feedback from the candidates' supervisors. Ms. Atkinson received unsolicited feedback from existing partners before the interviews about the two candidates who were ultimately selected—Jordan Hall, a 33-year-old woman, and Maggie Steele, a 27-year-old woman. She says she didn't consider this feedback when choosing the new partners. Ms. Pryor was 41 years old at this time. Ms. Atkinson says she didn't know any of the candidates' ages when considering who to promote.

Ms. Atkinson asked each candidate the same interview questions about their backgrounds and how they would handle certain situations. Ms. Atkinson took notes during each interview. She noted that Ms. Pryor's interview raised "red flags": Ms. Pryor described problem solving tactics that were the opposite

6

from what should normally be done, and she proposed courses of action that were "just not good practice for a seasoned [human resources] practitioner." In contrast, Ms. Atkinson noted Ms. Hall looked at the big picture, used data to make strategic decisions, and connected her interview answers to Ascension's strategic plan. She noted Ms. Steele had a background in developing relationships and emphasized improving organizational structure in her answers, which Ms. Atkinson felt would be "critical" to being a successful partner. Ms. Atkinson noted that the fourth interviewee—Lauri Yancey, a 52-year-old woman— used "old" examples and thinking about the big picture or strategic outlook wasn't in her comfort zone.

Ms. Atkinson told Ms. Pryor that she wasn't chosen for the partner openings and told her she needed more experience. Ms. Pryor sent Mr. Daech an email asking what she had done "to deserve [this] treatment" and asking if it was connected to her refusing to be bullied by Ms. Harris. She asserted in the email that she was being retaliated against and subjected to the "discriminatory acts" of being ignored, bullied, lied to, and mistreated. She ended the email by saying she didn't want any follow up about her allegations.

The next day, Ms. Atkinson announced that Ms. Hall and Ms. Steele were the new partners. Ms. Pryor emailed Mr. Daech and Ms. Atkinson to complain that Ms. Hall and Ms. Steele were the newest members of the advisor team, Ms. Atkinson chose them before the interviews, and complaining about Ms. Harris resulted in her being labeled as a "trouble[]maker." She said she was being bullied, defamed, and discriminated against. Mr. Daech responded, inviting Ms.

Pryor to meet to discuss her concerns, but she declined the invitation, saying her past complaints caused "the character defamation, discrimination and retaliation." Ms. Pryor says she then spoke with Mr. Daech by phone, and during that conversation she alleged that her treatment stemmed from her being an older, African American woman. Mr. Daech denies that she made this statement.

Another part of Ascension's restructuring was that advisors became "specialists" and entered a different chain of command that didn't include either Ms. Atkinson or Mr. Daech. Before the interviews for the new partner openings, the current advisors had a meeting to learn about the restructuring changes. Ms. Hall and Ms. Steele weren't invited to the meeting. Ms. Pryor says Ms. Atkinson deliberately didn't invite them because she'd already decided they might not become specialists. Ascension explains their exclusion by saying Ms. Atkinson had been asked by management to identify two advisors who might transition to the partner position, she identified Ms. Hall and Ms. Steele as having potential, and they were then left off the email invitation to the meeting by another employee's mistake.

Because she wasn't promoted to partner, Ms. Pryor transitioned to the specialist role. She then asked Mr. Daech to delete the corrective action from her file, asserting that it was evidence of discrimination and retaliation for her complaints about Ms. Harris. Ascension has a policy that employees must challenge a corrective action within three days, so Mr. Daech couldn't withdraw the action at this point. He met with her to discuss her concerns and to remind

her how to file a complaint within her own department since she no longer
reported to him.

*Ms. Pryor's Termination*

In September 2020, Ms. Pryor met with her new supervisor, Jay Huckabee,
for her monthly performance review. Mr. Huckabee identified opportunities for
improvement and noted multiple instances that Ms. Pryor hadn't correctly
documented work.

Later that month, Ascension determined it employed nine more specialists
than it needed, so Mr. Huckabee and Laura Majewski, another specialist
supervisor, were tasked with selecting specialists to terminate in a reduction in
force. Mr. Huckabee and Ms. Majewski reviewed all fifty-four specialists under
their supervision and terminated specialists with active performance counseling
records or performance deficiencies—Ms. Pryor was one of these employees
because of the corrective action. None of the specialists retained after the
reduction had active corrective actions on file. Mr. Huckabee and Ms. Majewski
were unaware Ms. Pryor had complained about Ms. Harris when they made the
decision to terminate her employment. The record doesn't indicate whether they
knew she had complained about discrimination or retaliation.

Ms. Pryor brought this lawsuit, alleging Ascension discriminated against
her based on her age when it didn't promote her to partner and retaliated against

her based on her age, race, and sex for complaining about her treatment. Ascension moves for summary judgment on both counts.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). A court accepts the non-movant's evidence as true and draw all inferences in his favor. Id. at 255. Nevertheless, the nonmoving party is not entitled to "[i]nferences that are supported by only speculation or conjecture." Argyropoulos v. City of Alton, 539 F.3d 724, 732 (7th Cir. 2008) (alteration in original) (citing Fischer v. Avanade, Inc., 519 F.3d 393, 401 (7th Cir. 2008)). The existence of an alleged factual dispute, by itself, won't defeat a summary judgment motion; "instead the nonmovant must present definite, competent evidence in rebuttal," Parent v. Home Depot U.S.A., Inc., 694 F.3d 919, 922 (7th Cir. 2012) (citing Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004)), and "must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 490 (7th Cir. 2007) (citations omitted); *see also* Fed. R. Civ. P. 56(e)(2).

III.   DISCUSSION

Ascension moves for summary judgment on both of Ms. Pryor's claims.

A.  *ADEA Failure to Promote Claim*

The ADEA prohibits intentional discrimination against persons who are 40 years old or older. 29 U.S.C. § 623, 631(a). "To prevail on an age-discrimination claim, the plaintiff must prove that [her] age was the 'but-for' cause of the challenged job action. In other words, under the ADEA 'it's not enough to show that age was *a* motivating factor. The plaintiff must prove that, but for [her] age, the adverse action would not have occurred.'" Wrolstad v. Cuna Mut. Ins. Soc'y, 911 F.3d 450, 454 (7th Cir. 2018) (first quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 161, 177-178 (2009); and then quoting Martino v. MCI Commc'ns Servs., Inc., 574 F.3d 447, 455 (7th Cir. 2009)).

A plaintiff may show age discrimination by using the McDonnell Douglas burden-shifting framework. Schaffner v. Glencoe Park Dist., 256 F.3d 616, 620 (7th Cir. 2001); *see* McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, the plaintiff in a failure-to-promote case must show "(1) she was 40 or older, (2) she applied for and was qualified for the position sought, (3) she was rejected for the position, and (4) someone substantially younger than she was given the position." Schaffner v. Glencoe Park Dist., 256 F.3d at 620 (citation omitted). "If the plaintiff meets each element of her prima facie case, 'the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for

11

the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" McDaniel v. Progress Rail Locomotive, Inc., 940 F.3d 360, 368 (2019) (quoting Skiba v. Ill. Cent. R.R. Co., 884 F.3d 708, 719-720 (7th Cir. 2018)).

The McDonnell Douglas framework isn't the only method a plaintiff may use to prove her claim; it "is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's age. Id. (quoting Johnson v. Advoc. Health & Hosps. Corp., 892 F.3d 887, 894 (7th Cir. 2018)). "However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse employment action because of [a proscribed factor]." Id. (quoting Skiba v. Ill. Cent. R.R. Co., 884 F.3d at 720) (emphasis omitted).

Both parties reference the McDonnell Douglas framework, so the court starts there and then looks to all the evidence cumulatively presented to determine whether a reasonable factfinder could conclude Ms. Pryor wasn't promoted because of her age.

The parties agree that Ms. Pryor satisfies the first, third, and fourth elements of the prima facie McDonnell Douglas test—that Ms. Pryor was over 40 years old, she wasn't chosen to be a human resources business partner, and two younger women were selected instead. Ascension contends Ms. Pryor wasn't

qualified to be a partner and so doesn't meet the second element. It argues that the corrective action against Ms. Pryor disqualified her from being eligible for a promotion, and she never became eligible because Ms. Atkinson didn't waive the requirement or get Mr. Daech's approval.

Ms. Pryor responds that Ms. Atkinson had the discretion to let Ms. Pryor apply for the partner position and purportedly didn't give any weight to the candidates' disciplinary histories when choosing the new partners. Ms. Pryor argues that this means the corrective action didn't make her ineligible. Ms. Pryor also asserts she was qualified for the job because she was already performing partner duties. Ascension disputes that Ms. Pryor ever worked unofficially as a partner.

"[T]he qualifications for a position are . . . a business decision, one courts should not interfere with." Schaffner v. Glencoe Park Dist., 256 F.3d at 621 (quoting Gorence v. Eagle Food Ctrs., 242 F.3d 759, 765 (7th Cir. 2001)); *see also* Baron v. City of Highland Park, 195 F.3d 333, 341 (7th Cir. 1999) ("[T]his Court does 'not sit as a superpersonnel department that reexamines an entity's business decisions.'" (quoting Lindemann v. Mobil Oil Corp., 141 F.3d 290, 300 (7th Cir. 1998))). Ms. Atkinson said she relied solely on the candidates' interview performances to choose the new partners, and she would have selected Ms. Pryor for the position—despite the documented disciplinary action against her—had she been one of the best candidates. So, although there were additional steps that Ms. Atkinson would have needed to take to promote Ms. Pryor to partner, a

reasonable jury could conclude that Ms. Pryor's earlier corrective action didn't disqualify her from the job.

The record presents conflicting evidence about whether Ms. Pryor was already working as a partner. Even construing the evidence in Ms. Pryor's favor, neither party argues that any unofficial work as a partner played into Ms. Atkinson's decision. Rather, Ms. Atkinson reported that she relied entirely on the interviews and didn't choose Ms. Pryor because of her poor interview performance. Ms. Pryor already working unofficially as a partner therefore was irrelevant to whether Ms. Atkinson thought she was qualified for the job.

Next, the burden shifts and Ascension must articulate a legitimate, nondiscriminatory reason for the business decision. Hiring someone who the employer believes is better qualified for the position is a legitimate, nondiscriminatory reason for the action. Riley v. Elkhart Cmty. Schs., 829 F.3d 886, 893 (7th Cir. 2016) (citing Scruggs v. Garst Seed Co., 587 F.3d 832, 838 (7th Cir. 2009)). Employers may base a promotion decision on subjective criteria, such as interview performance. Murray v. Golden Rule Ins. Co./United Health Corp., 23 F. Supp. 3d 938, 953 (S.D. Ind. 2014) (citing Armstrong v. City of Milwaukee, 204 F. App'x 559, 563 (7th Cir. 2006)). Ascension asserts that Ms. Atkinson chose Ms. Hall and Ms. Steele for the partner openings based on their strong interview performances, and she didn't choose Ms. Pryor because her interview raised red flags. Ms. Pryor doesn't dispute that Ms. Hall and Ms. Steele

14

performed better in the interviews than she did, but she asserts that Ascension's explanation is pretext.

To establish pretext, Ms. Pryor must show that "(1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the failure to promote; or (3) the proffered reasons were insufficient to motivate the failure to promote." Baron v. City of Highland Park, 195 F.3d at 341 (citation omitted). The overarching inquiry at the pretext stage is whether Ascension "honestly believed the reasons it has offered" or if the "proffered reason . . . was a lie." Skiba v. Ill. Cent. R.R. Co., 884 F.3d at 724 (first quoting O'Leary v. Accretive Health, Inc., 657 F.3d 625, 635 (7th Cir. 2011); and then quoting Ineichen v. Ameritech, 410 F.3d 956, 961 (7th Cir. 2005)).

Ms. Pryor says Ascension can't believe Ms. Atkinson chose the new partners based on the interviews because she decided before the interviews that Ms. Hall and Ms. Steele wouldn't become specialists; she references that they were left off the specialist meeting invitation. Ms. Atkinson's testimony unequivocally states she relied solely on the interviews to choose the two new partners. That she identified Ms. Hall and Ms. Steele as having potential beforehand doesn't mean Ascension doesn't believe she ultimately chose them based on their interview performance.

Next, Ms. Pryor argues a jury could conclude age was a determinative factor for Ms. Atkinson because she said Ms. Yancey's examples were old. But Ms. Pryor interprets Ms. Atkinson's testimony out of context. Ms. Atkinson

15

explained that Ms. Yancey's "examples were old. It seemed that she didn't do anything recent that would lead [Ms. Atkinson] to believe that [Ms. Yancey] is progressing and ready really for that next step." The use of the word "old" doesn't automatically create an inference of age discrimination, and Ms. Atkinson's comment, even read out of context, is not age-related. *See* Schaffner v. Glencoe Park Dist., 256 F.3d at 622 (citing Fortier v. Ameritech Mobile Commc'ns, Inc., 161 F.3d 1106, 1113 (7th Cir. 1998)) (finding comments and "stray remarks" didn't raise inference of age discrimination).

Ms. Pryor also says Ms. Atkinson's testimony isn't credible because she claimed to not have considered the candidates' experience, but then told Ms. Pryor she didn't get the job because she needed more experience. Again, this misrepresents Ms. Atkinson's statements. Ms. Atkinson said she didn't consider the candidates' amount of human resources experience, but the evidence shows she did consider their qualitative experience by asking about their backgrounds and soliciting examples about how they would handle certain situations in the interviews. Ms. Atkinson's testimony is consistent with what she told Ms. Pryor and with Ascension's explanation, and it doesn't establish pretext.

Stepping back from the McDonnell Douglas framework and evaluating the evidence holistically, a reasonable jury couldn't find that Ms. Atkinson didn't promote Ms. Pryor because of her age. Outside of the evidence already discussed, the only other evidence Ms. Pryor presents to show Ms. Atkinson's discrimination is that the two younger applicants were promoted over the two older applicants.

16

This doesn't create a genuine issue of material fact that Ms. Pryor was discriminated against in violation of the ADEA. *See* <u>Jackson v. E.J. Brach Corp.</u>, 176 F.3d 971, 986 (7th Cir. 1999); <u>Perez v. Colwell Sys., Div. of Deluxe Corp.</u>, 83 F. Supp. 2d 976, 983 (C.D. Ill. 1999) (citation omitted).

It's also worth noting that Ms. Atkinson is older than Ms. Pryor. While not dispositive, this fact is significant when evaluating an ADEA claim, and the employee faces an "uphill battle" to show discrimination when this fact is present. <u>Jackson v. E.J. Brach Corp.</u>, 176 F.3d at 984 n.2. Ms. Pryor doesn't discuss or try to discount Ms. Atkinson's age, and she hasn't overcome it in this case.

Overall, the holistic look at the record doesn't reveal any direct or circumstantial evidence that Ms. Atkinson passed over Ms. Pryor for promotion because of her age. No reasonable trier of fact could find that Ms. Pryor's age was the but-for cause of her not being promoted. Accordingly, the court grants Ascension's motion for summary judgment on Ms. Pryor's ADEA claim.

### B. Title VII and ADEA Retaliation Claim

Ms. Pryor also alleges that Ascension violated Title VII and the ADEA by retaliating against her for complaining about Ms. Harris. Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-

2(a)(1). In both Title VII and ADEA retaliation cases, "a plaintiff must come forward with sufficient evidence for a reasonable jury to conclude that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) causation." Lewis v. Ind. Wesleyan Univ., 36 F.4th 755, 761 (7th Cir. 2022) (citations omitted). The parties may use the McDonnell Douglas burden shifting framework. Id. Ultimately, a plaintiff's claim will survive a summary judgment motion if "a reasonable juror could conclude there was a causal link between the protected activity or status and the adverse action." Id. (quoting Rozumalski v. W.F. Baird & Assocs., 937 F.3d 919, 924 (7th Cir. 2019)).

The parties don't dispute that Ms. Pryor's corrective action and termination were adverse employment actions. Ascension raises several arguments in favor of summary judgment: that Ms. Pryor didn't engage in protected activity, that the decisionmakers for the adverse actions didn't know Ms. Pryor had engaged in protected activity, that there isn't causation between Ms. Pryor's complaints and the adverse actions, and that Ascension had legitimate reasons to issue the corrective action and there isn't evidence of pretext.

For conduct to be considered protected activity, the plaintiff must show she "opposed conduct prohibited by Title VII, or at a minimum that she had a 'reasonable belief' she was challenging such conduct." Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1147 (7th Cir. 1997) (citation omitted). "[T]he complaint must indicate [that] discrimination occurred because of sex, race, . . . or some

18

other protected class." Skiba v. Ill. Cent. R.R. Co., 884 F.3d at 718 (alternation in original) (quoting Tomanovich v. City of Indianapolis, 457 F.3d 656, 663 (7th Cir. 2006)). "[C]omplaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." Id. (quoting Tomanovich v. City of Indianapolis, 457 F.3d at 663). "[M]embership in a protected class, without anything more, is not enough to transform [a] general complaint about improper workplace practices into a complaint opposing . . . discrimination." Cole v. Bd. of Trs. of N. Ill. Univ., 838 F.3d 888, 901 (7th Cir. 2016) (first citing Tomanovich v. City of Indianapolis, 457 F.3d at 664; and then citing Gleason v. Mesirow Fin., Inc., 118 F.3d at 1147). The law doesn't prohibit "'retaliation' based on personal animosities." Monroe v. Ind. Dep't of Transp., No. 1:05-cv-1163-DFH-WTL, 2007 WL 178629, at *7 (S.D. Ind. Jan. 19, 2007).

The plaintiff must also "produce evidence that the defendant had actual knowledge of the protected activity." Eaton v. J.H. Findorff & Son, Inc., 1 F.4th 508, 512-513 (7th Cir. 2021) (citations omitted). "It is not sufficient that a decisionmaker could have or should have known about the employee's complaint." Id. (citations omitted). The defendant must know not only about the complaint, but that it constituted protected activity. Id. A plaintiff's speculation that a decisionmaker knew about the protected activity is insufficient. Consolino v. Towne, 872 F.3d 825, 830 (7th Cir. 2017) (citation omitted).

Ms. Pryor argues that she engaged in protected activity at multiple points, which the court evaluates chronologically. First, Ms. Pryor says she engaged in protected activity when she told Mr. Kile she was disappointed that as soon as Ms. Harris requested a meeting, Mr. Kile held one, whereas he hadn't scheduled one when she requested it. She also identifies her email to Mr. Kile, Ms. Harris, and Mr. Daech, following her initial meeting with Mr. Kile and Ms. Harris, in which she complained about Ascension having a hostile work environment. Ms. Pryor didn't reference any protected class in these communications, nor could these complaints permit someone to infer a connection to Ms. Pryor's protected status. Moreover, there isn't any indication that the conflict between Ms. Harris and Ms. Pryor was anything more than personal animosity. Her complaint to Mr. Kile and subsequent email to Mr. Kile, Mr. Daech, and Ms. Harris weren't protected activity. Even if they were, none of those people were the decisionmaker for Ms. Pryor's corrective action or termination.

This is the only purported protected action Ms. Pryor took before Ms. Atkinson issued the corrective action. The only evidence in the record that Ms. Atkinson knew about those complaints before she issued the corrective action is Ms. Pryor's speculation that Ms. Atkinson had a "preconceived notion about her." [Doc. No. 40-1 at 151]. Ms. Pryor also generally alleges that Ms. Atkinson knew about her complaints because she says Mr. Daech told Ms. Atkinson he agreed with issuing the corrective action and he attended the meeting in which Ms. Atkinson delivered it. Even if Ms. Pryor's complaints about Ms. Harris constituted protected activity, Ms. Pryor's speculation that Ms. Atkinson knew

about Ms. Pryor's complaints isn't enough to show Ms. Atkinson had actual knowledge.

Nor does Mr. Daech's involvement invoke the "cat's paw" theory. *See* Metzger v. Ill. State Police, 519 F.3d 677, 682 (7th Cir. 2008) ("[I]n certain circumstances a non-decisionmaker can exert influence of such a degree as to make his employer liable for his actions. However, 'where a decision maker is not wholly dependent on a single source of information, but instead conducts its own investigation into the facts relevant to the decision, the employer is not liable . . . .'" (citations omitted)). The evidence indicates Mr. Daech didn't discuss the Pryor-Harris conflict with Ms. Atkinson, so Mr. Daech's knowledge that Ms. Pryor complained about Ms. Harris can't be imputed onto Ms. Atkinson, especially when Ms. Atkinson investigated and chose to issue the corrective action. Accordingly, Ms. Pryor's claim that her corrective action was retaliation can't survive summary judgment.

Ms. Pryor's corrective action appeals don't change this outcome. Ms. Pryor says she engaged in protected activity when she appealed the corrective action to Ms. Atkinson. She testified that she told Ms. Atkinson the corrective action was in retaliation for her complaints about Ms. Harris. Ascension disputes that she said this. Construing the facts in the light most favorable to Ms. Pryor, the court assumes Ms. Pryor did bring up her drama with Ms. Harris during this meeting. But this doesn't mean Ms. Pryor connected her complaints to her protected status or gave facts sufficient for Ms. Atkinson to infer a connection.

Knowing that Ms. Pryor complained about Ms. Harris isn't enough to suggest Ms. Pryor engaged in protected activity.

To try to rebut this conclusion, Ms. Pryor later filed a declaration, which says she specifically complained about age and race discrimination each time she complained to Ms. Atkinson. A litigant can't contradict prior testimony with a declaration to create a genuine issue of material fact to survive summary judgment. *E.g.*, Servicios Especiales al Comercio Exterior v. Johnson Controls, Inc., No. 08-cv-1117, 2011 WL 1498591, at *1 (E.D. Wis. Apr. 19, 2011) (citing Bank of Ill. v. Allied Signal Safety Restraint Sys., 75 F.3d 1162, 1168 (7th Cir. 1996)). Based on these facts, no reasonable juror could find that Ms. Pryor connected her complaints to her protected status or that Ms. Atkinson could infer the complaints were protected activity.

Ms. Pryor also brings up her appeal to Mr. Daech. She argues she specifically complained about age and race discrimination during their conversation and cites her testimony saying she complained about race, gender, and age discrimination to Mr. Daech "each time she had a concern, especially around the reduction in force." [Doc. No. 40-1 at 201]. Ascension disputes that they discussed her protected status during this conversation; it points to Ms. Pryor's testimony about that specific conversation, where Ms. Pryor didn't testify that she mentioned any protected class. It argues she can't salvage her case by generally asserting she brought up her race, gender, and age during each conversation with Mr. Daech.

22

The court assumes for purposes of this summary judgment motion that Ms. Pryor connected her complaint about her treatment to her age, race, and gender. But that she complained to Mr. Daech when she appealed her corrective action doesn't establish that Ms. Atkinson knew about the protected activity when she decided to issue the corrective action or when she declined to overturn it during the appeal process. Ms. Pryor's appeal meeting with Mr. Daech took place after both of those events. Nor can Ms. Pryor impute Mr. Daech's knowledge to apply retroactively to Ms. Atkinson. No reasonable juror could conclude that Ms. Atkinson issued the corrective action because Ms. Pryor engaged in protected activity after the fact.

Accordingly, no reasonable juror could find that Ms. Atkinson issued the corrective action in retaliation for Ms. Pryor's complaints about Ms. Harris.

Turning to Ms. Pryor's claim that Ascension unlawfully retaliated against her when it terminated her employment, Ms. Pryor simply argues that because the corrective action was retaliatory, her termination was also retaliatory. She doesn't cite to any authority to support this assertion, and because the court already determined that Ms. Pryor's corrective action wasn't unlawful retaliation, it won't adopt that leap in logic with regard to her termination.

Ms. Pryor also argues that she engaged in protected activity when she emailed Mr. Daech and Ms. Atkinson and then talked to Mr. Daech about not getting promoted to partner. In her emails, she complained about her treatment and alleged she was being retaliated and discriminated against. While those

emails don't identify any protected class, Ms. Pryor testified that she later spoke with Mr. Daech and claimed that she didn't get the promotion because she was an "older Black woman." Mr. Daech disputes that she said this. Assuming for purposes of this summary judgment motion that she said this, this complaint constitutes protected activity.

But the record shows that the decisionmakers for the reduction in force—Mr. Huckabee and Ms. Majewski—didn't know Ms. Pryor had complained about Ms. Harris, and there is no evidence to indicate that they knew she complained about her non-promotion or her treatment or that she'd connected any of her complaints to her age, race, and gender. Ms. Pryor suggests that this lack of evidence should permit an inference that they knew she engaged in protected activity. No such inference is permissible: "[i]t is the plaintiff's responsibility, on summary judgment, to make a 'showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.'" Johnson v. Advoc. Health and Hosps. Corp., 892 F.3d 887, 896 (7th Cir. 2018) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). Mere speculation that Mr. Huckabee and Ms. Majewski might have known Ms. Pryor engaged in protected activity isn't sufficient to defeat a summary judgment motion, and Ms. Pryor hasn't otherwise presented any evidence to suggest that they were aware of her protected activity.

Ms. Pryor hasn't pointed to evidence from which a jury could conclude that the decisionmakers knew or could infer she'd engaged in protected activity, so summary judgment is appropriate on her retaliation claim.

## IV.    CONCLUSION

For the foregoing reasons, the court GRANTS Ascension's motion for summary judgment, [Doc. No. 33], and DIRECTS the clerk to enter judgment accordingly.

SO ORDERED.

ENTERED: <u>January 31, 2023</u>

 /s/ Robert L. Miller, Jr.
Judge, United States District Court

Distribution to all counsel of record via CM/ECF.